# Al YOUNGER et al *v.* THOMAS INTERNATIONAL CORPORATION

81-247                                                629 S.W. 2d 294

Supreme Court of Arkansas
Opinion delivered March 15, 1982

*James D. Causey,* Memphis, Tenn., and *Frierson, Walker, Snellgrove & Laser,* by: *G. D. Walker,* for appellants.

*Sharpe & Morledge, P.A.,* by: *W. Frank Morledge;* and *Arnstein, Gluck & Lehr,* Chicago, Ill., by: *Arthur L. Klein, Richard K. Wray,* and *Philip J. Nathanson,* for appellee.

JOHN I. PURTLE, Justice. The trial court rejected the claim of certain former Warwick salaried employees in a class action for termination benefits pursuant to an agreement between Warwick and the salaried employees. On appeal the appellants argue the trial court erred because: (1) the severance pay policy of Warwick became a binding unilateral contract; (2) the ownership change amounted to the closing of an organizational unit for severance pay purposes; (3) subsequent positions offered to the appellants were not equivalent; (4) interpretations at a variance to written policy were invalid; (5) appellants were entitled to severance pay; (6) appellants were entitled to two weeks compensation in lieu of notice of termination; and, (7) appellants should be reimbursed for expenses caused by appellee's designation of unnecessary material in the transcript. The appellee replied to each point, and additionally argued that fundamental principles of fairness prohibited the appellants from reaping windfall benefits. We find that the trial court's judgment should be upheld.

The facts are generally undisputed and the appeal centers on the interpretation of the contract between Warwick and the salaried employees. The essence of the contract is as follows:

I. STATEMENT:

A. *Purpose.*

The purpose of termination allowance is to provide financial assistance for a short period of time

to allow for readjustment for salaried employees who are terminated through no fault of their own.

B. *Eligibility*

The following circumstances result in termination allowance eligibility for permanent full time employees:

1. Termination resulting from closing an organizational unit.
2. Termination resulting from job elimination or manpower reductions.
3. Terminations resulting from special circumstances, as determined by members of the President's staff and approved by the Director of Personnel.

Employees who have received formal notice of termination, and later resign voluntarily, are eligible for termination allowance, provided they give at least two weeks notice. Those who have *not* been given formal notice of termination are *not* eligible for termination allowance if they resign voluntarily.

C.  *  *  *

D. *Pay in Lieu of Notice*

Every effort should be made to give the employee two weeks notice prior to termination. Where this is not possible, he will be granted two weeks pay in lieu of notice. This is in addition to termination allowance and accrued vacation.

E.  * * *

F.  * * *

G. *Effect of Job Placement Opportunities*

Termination allowance will not be paid when an employee is offered an equivalent job opportunity.

For purposes of this policy, an "equivalent job opportunity" must meet all of the following conditions:

1. No relocation required.
2. No significant reduction in status. A reduction of more than one salary grade will be considered significant, and in some instances a change from exempt to non-exempt status or from salaried to hourly status, will also be considered significant.
3. Reasonable use made of employee's background and experience.

Warwick had manufactured television sets at its Forrest City plant for a number of years but had fallen onto hard times financially. Employment had dwindled from a high of more than 2,500 to about 500 at the time the plant was sold to SMC. The effective date of the sale was December 29, 1976, during the Christmas holidays; when the employees returned to work on January 3, 1977, they were employees of SMC. All employees continued to work for SMC at the same or higher salaries than they had received from Warwick.

SMC did not have in force the same exact policies which existed at Warwick. However, approximately the same benefits were eventually adopted and made retroactive to the date of the transfer. In the meantime, Warwick changed its name to Thomas International Corporation. Thomas agreed to abide by the former Warwick policies for the benefit of any SMC employees who were terminated prior to implementation of equivalent policies by SMC. The record does not reveal whether any employees were actually paid by Thomas.

The trial court held the employees had not been terminated in accordance with the terms of Warwick's policy and were therefore not entitled to termination benefits. The court also held that those persons who had been transferred from other locations to the Forrest City SMC plant had been

assisted in doing so by Warwick and had accepted new employment, thus were not entitled to termination allowances. Under Section G of the Warwick policies this amounted to a non-equivalent job opportunity. Finally, the court held that the new benefits offered by SMC were in some respects greater than those offered by Warwick and in some respects they were less. The court was unable to determine which set of policies was over-all in the best interest of the employees.

Much of the trial centered around whether the Warwick policies were communicated to the appellants. There is no need to belabor this point because the evidence clearly indicated the policies were communicated and that the employees accepted them. It is obvious the trial court found the policies binding. The question of termination is crucial to the resolution of this matter. Unless the appellants were terminated they would be entitled to neither termination allowances, nor to benefits in lieu of notice of termination. We think the purpose of the Warwick policies is succinctly defined in the first part of the policy, Section A, entitled "Purpose":

> The purpose of termination allowance is to provide financial assistance for a short period of time to allow for readjustment for salaried employees who are terminated through no fault of their own.

In the present case all employees continued to work at the same plant, manufacturing the same product, and doing the same or similar job. Each of them received at least the salary which they were receiving prior to the transfer from Warwick to SMC. It is difficult to envision a termination under the circumstances of this case. So far as the appellants are concerned, the only change of any significance was the name of their employer. In fact, SMC had been organized as a spin-off corporation from Warwick several months before it became the property of the present owners.

This matter has not been previously addressed in Arkansas. We are not unmindful of the need to protect employees who are terminated through no fault of their

own. We are also aware of the fact that other jurisdictions have apparently treated this question in a different manner.

The appellants rely heavily upon the case of *Dahl* v. *Brunswick Corporation*, 277 Md. 471, 356 A. 2d 221 (1976). In the *Dahl* case the court held there was a termination when the business was taken over by a new owner and the employees continued working at the new plant. It does not appear that there was a purpose stated in the policies in the *Dahl* case, thus the Maryland court took the words of the policies at their literal meaning. We agree that the proper rule of construction in regard to ambiguous contracts is to construe them against the party that drafted them. In the *Dahl* case the policies did not define the meaning of termination. In the present case is it clear that the termination allowance was to provide financial assistance for former employees terminated through no fault of their own. There was no proof that any of the appellants needed the financial assistance for readjustment due to a period of unemployment.

The trial court held that the transfer from Warwick to SMC did not constitute the closing of an organizational unit within the meaning of the severance policy. Policy Provision B (1) states that closing an organizational unit amounts to termination. However, Section G of the policies states that termination will not be paid when an employee is offered an equivalent job opportunity. In determining whether this action constituted the closing of an organizational unit, the trial court considered both the policies as written and the history of the interpretation and implementation of the policies by those who had administered them. The testimony of Warwick officials was substantial and to the effect that when there had been merely a change in name and ownership, the policy had been interpreted to mean there was no termination and that the employees had been offered an equivalent job opportunity. We think the facts in this case substantiate the findings of the court on this issue. Warwick had recognized and implemented the termination and non-equivalent job opportunity policies when their plants at Covington, Tennessee, and Zion, Illinois, were closed. The transfer of ownership of the last

two mentioned plants included a change in production or a shut-down. It is obvious by all of the terms of the policy in question that the employees in those cases were entitled to termination or equivalent job opportunity allowances. Under the circumstances of the present case employees lost no time from work, received the same or higher wages after the change, and retained approximately the same fringe benefits; therefore they were not terminated.

Appellants argue that the jobs offered and accepted by the appellants were not equivalent job opportunities within the meaning of the policy. So far as the former employees of Warwick at the Forrest City plant are concerned, we do not consider the question of equivalent job opportunity because we have found they were not terminated and that there was no closing of an organizational unit. The only persons to be considered under the equivalent job opportunity portion of the policy would be those who transferred to Forrest City from other plants. The trial court held that employees in this category had the option of taking the new employment and not being terminated or accepting termination and receiving the allowance. Witnesses on both sides of the case testified that the application of the policy by Warwick in this respect had been consistent and longstanding. There was substantial evidence that the employees waived their rights under the equivalent job opportunity section by accepting the employment arranged for them by Warwick. It is true the court specifically found that these transferred employees were offered non-equivalent job opportunities. However, the court also found that the policy had been interpreted to mean that when a non-equivalent job opportunity situation existed and the employee accepted a new job offered by Warwick, the employee accepting it was not entitled to termination allowances.

The prior interpretations by Warwick of the foregoing provisions of the termination policy were properly applied in the present case, even if appellants are correct in stating that prior interpretations of the policy at other locations were unknown to them. We think the parol testimony offered in this case was admissible for two reasons. First, the matter was opened up by the appellants' inquiry into treatment of

employees at the Midwest Cabinet Facility which had previously been shut down. The second and most important reason for allowing this testimony is that such testimony was offered only to prove an independent collateral fact about which the written contract was silent. It was not offered to alter, vary, or contradict the written terms of the contract. *Loe* v. *McHargue,* 239 Ark. 793, 394 S.W. 2d 475 (1965); *Lane* v. *Pfeifer,* 264 Ark. 162, 568 S.W. 2d 212 (1978).

The argument that the appellants were entitled to severance pay under the terms of the policy has been discussed adequately along with the other points in question. Section D of the policy provided that employees should receive two weeks notice prior to termination. Failure to give two weeks notice would entitle the employees to termination allowances for these two weeks. However, since we have already held there were no terminations, there was no need for notice and the appellants are not entitled to benefits for lack of notice, nor to severance pay.

Appellants contend they are entitled to certain expenses by reason of the appellee designating additional parts of the record on appeal which were not necessary for the purpose of the appeal. In view of the long and complicated trial in this matter we are unable to say that the appellee clearly designated the additional material for the purpose of causing the appellants to expend more money. The matter of the costs of the action will be set out in the Mandate.

Appellee argues that fundamental principles of fairness prohibit appellants from reaping windfall benefits inconsistent with the purpose of Warwick's policy. We see no need to delve into this point in view of our holding on appellants' arguments.

Affirmed.